# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY BAUMGARDNER | ) | CASE NO.  5:09-CV-1613 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| BIMBO FOOD BAKERIES | ) | MEMORANDUM OPINION AND |
| DISTRIBUTION, INC. | ) | ORDER |
| | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the motion of Defendant Bimbo Food Bakeries Distribution, Inc. ("BFBD") to dismiss a portion of Plaintiff Timothy Baumgardner's complaint (Doc. No. 1) for failure to state a claim upon which relief may be granted (Doc. No. 6) and BFBD's separate motion to strike Baumgardner's demand for a trial by jury. (Doc. No. 7.) For the following reasons, both of BFBD's motions are **GRANTED**.

## I.      FACTUAL AND PROCEDURAL HISTORY

Except where noted, the facts of this case are taken from Baumgardner's Complaint and are assumed true for purposes of this Memorandum Opinion and Order. Plaintiff Timothy Baumgardner is a resident of Stark County, Ohio. Defendant BFBD Food Bakeries, Inc., is a Delaware corporation with its principal place of business in Pennsylvania. (Doc. No. 2, ¶ 3.)

On or about October 1, 2001, Baumgardner purchased from BFBD, formerly known as George Weston Bakeries Distribution Inc., the right to distribute assorted bakery products in a defined sales area in northeast Ohio (hereinafter sometimes referred to as "the

Route"). A distribution agreement governed the relationship, and that agreement contained provisions relating to the sale and transfer of Baumgardner's distribution rights. On January 12, 2009, BFBD issued Baumgardner a notice of termination pursuant to the distribution agreement.

Under the distribution agreement, Baumgardner was allowed to sell or otherwise transfer his distribution rights. Any such transfer or sale, however, was subject to two conditions: (1) the prior written approval of BFBD, and (2) a right of first refusal on the part of BFBD under the same terms and conditions of the proposed sale or transfer. Baumgardner alleges that he obtained a ready, willing, and able buyer who agreed to purchase the distribution rights for $325,000, and that he gave BFBD notice of his intent to sell on or about January 29, 2009.

On February 6, 2009, BFBD acknowledged, in a written letter, receipt of Baumgardner's intent to sell the distribution rights. BFBD, however, "claim[ed] the sale price was $121,706 rather than $325,000." (Doc. No. 1, ¶ 12.) BFBD then attempted to exercise its right of first refusal at the lower price. A dispute ensued. Baumgardner submitted sworn affidavits documenting his intent to sell the distribution rights for $325,000. During the dispute, BFBD operated the route previously operated by Baumgardner, but, according to Baumgardner, did so in a manner which caused profits to decrease. Furthermore, Baumgardner claims that BFBD "failed to make reasonable payment to Baumgardner for the income generate [sic] during" this time. (Doc. No. 1, ¶ 19.)

Baumgardner claims that, due to financial hardship resultant from BFBD's termination of his Route, he proceeded with the sale of the Route to BFBD for $140,430, but reserved the right to seek redress for damages arising out of the distribution agreement or in tort.

On June 17, 2009, Baumgardner filed a civil action against BFBD in the Stark County Court of Common Pleas. BFBD removed the action to federal court on July 14, 2009,

2

pursuant to 28 U.S.C. §§ 1441 and 1446. On July 31, 2009, BFBD filed, separately, a motion to dismiss a portion (specifically, four out of seven) of Baumgardner's claims and a motion to strike Baumgardner's jury demand. (Doc. Nos. 6, 7.) Baumgardner filed a combined opposition on July 31, 2009 (Doc. No. 13), and BFBD thereafter filed separate replies. (Doc. Nos. 14, 15.)

## II.  LAW AND ANALYSIS

Baumgardner's complaint alleges seven claims for relief, numbered one through five, seven and eight.[1] BFBD's motion to dismiss addresses claims four, five, seven and eight. Following a discussion regarding the law of the state that governs this dispute, each will be discussed *seriatim*.

## A.  Choice of Law

The distribution agreement contains a choice-of-law provision in section 11.8 that specifies New York law as controlling the validity, performance and interpretation of the agreement. In its entirety, section 11.8 of the distribution agreement reads, "CONTROLLING LAW: The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of New York." (Doc. No. 1 at p. 17.) Baumgardner's complaint alleges seven claims for relief. Claims one through three sound in contract,[2] claims four and seven in tort, and claim five in quasi-contract. Claim eight seeks punitive damages based on BFBD's "conduct as identified in this complaint." (Doc. No. 2-1 at ¶ 69.)

In a diversity action, the choice of law rules of the forum state apply. *Glenway Indus., Inc. v. Wheelabrator-Frye, Inc.*, 686 F.2d 415, 417 (6th Cir. 1982) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Therefore, the Court applies Ohio choice of law rules. The Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws,

---

[1] By reason of error or otherwise, the complaint does not list a "Sixth Claim for Relief." In referring to the claims in the complaint, however, the Court shall refer to each as numbered in the complaint.

[2] These claims are not the subject of BFBD's motion to dismiss.

which provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987) (quoting *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 438-39 (1983)).

In its motion to dismiss, BFBD argues that, while New York law should apply to Baumgardner's claims pertaining to the "validity, interpretation and performance of the Distribution Agreement," Ohio law should apply to Baumgardner's intentional interference with contract claim (claim four) and unjust enrichment claim (claim five) because they "only indirectly pertain[]" to the Distribution Agreement.[3] Noticeably absent from Baumgardner's complaint, originally filed in state court, and in his opposition memorandum, is any discussion of choice-of-law. As discussed below, the Court finds BFBD underestimates the scope of the choice of law clause in the Distribution Agreement, and holds New York law applies to each claim in Baumgardner's complaint.

The Sixth Circuit has addressed the scope of choice of law clauses on multiple occasions. In *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131 (6th Cir.), *cert. denied*, 502 U.S.

---

[3] While BFBD seeks to enforce the choice of law clause, Baumgardner does not contest its validity and enforceability.

821 (1991), the court found that a choice of law clause applied to the plaintiffs' claims for fraud and misrepresentation, rejecting the plaintiffs' contention that the provision applied only to construction of the contract itself. 929 F.2d at 1139-1140. The language of the choice of law provision in *Moses* stated: "This Franchise and License Agreement and the construction thereof shall be governed by the laws of the state of Michigan [. . .]." *Id*. at 1140. Analyzing the clause, the court in *Moses* concluded that, "[c]learly, the clause refers to more than construction of the agreement; otherwise the first six words would be surplusage." *Id*. In reaching this conclusion, the court contrasted the choice of law provision at issue with the one scrutinized by the Fifth Circuit in *Caton v. Leach*, 896 F.2d 939 (5th Cir. 1990). In *Caton*, the Fifth Circuit held that a choice of law clause did not apply to the plaintiff's tort and *quantum meruit* claims where the clause provided that "[t]his agreement shall be construed under the laws of the State of California." *Caton*, 896 F.2d at 943. In a footnote, the court in *Caton* contrasted the narrow choice of law clause with an example of a broad provision choosing the law of a particular state to "govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this contract[.]" *Id*. at 943 n.3. In *Moses*, the Sixth Circuit concluded that the choice of law provision before it fell between the two extremes discussed in *Caton* (the actual clause at issue in *Caton* on the narrow end of the spectrum, and the hypothetical clause on the broad end). *Moses*, 929 F.2d at 1140.

Similarly, in *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993), the Sixth Circuit held that a choice of law provision contained in a franchise agreement was sufficiently broad to cover the plaintiff's claims for fraud and misrepresentation. *Id*. at 363. In doing so, the court rejected the franchisee plaintiff's assertions regarding narrow construction of the choice of law provision, finding that the plaintiff's fraud and misrepresentation claims

5

related directly to the franchise agreement. The Sixth Circuit panel in *Banek* stated that "[h]ad these claims only been tangentially related to the franchise relationship, we would be much more inclined to find the choice of law provision not applicable." *Id*. The choice of law provision at issue in *Banek* provided: "[t]his Agreement was made and entered into in the State [of] Georgia and all rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Georgia." *Id*.

The scope of the choice of law provision in the Distribution Agreement in this case falls somewhere between the one in *Moses* and the one in *Banek,* both of which were held by the Sixth Circuit to apply to tort claims in addition to claims under the contract containing the clause. As in *Banek*, the relationship between the claims not explicitly covered by the contract and the contract containing the clause is not tangential. Here, the intentional interference with contract claim and the unjust enrichment claim are very closely related to the distribution agreement. In his intentional interference claim, Baumgardner alleges BFBD tortiously interfered with his sale of the distribution route to Lori Turner. Baumgardner's unjust enrichment claim seeks damages for the eventual sale of the distribution route for (what he contends was) below market value. Both of these claims are closely related to "performance of the Agreement," particularly Article 6 of the Distribution Agreement, which controls the parties' transfer of rights. Additionally, and although not binding upon this Court, another district court in this circuit has applied New York law, rather than the law of the forum state, to a tortious interference claim in a case involving BFBD's predecessor, George Weston Bakeries Distribution Inc., and involving a choice-of-law clause identical to the one in this case. *See Matthews v. George Weston Bakeries Distrib*., No. 06-14875, 2007 U.S. Dist. LEXIS 74910 at *9 (E.D. Mich. Oct. 9, 2007). The Court finds the analysis in *Matthews* persuasive.

6

Accordingly, for the foregoing reasons, the Court concludes that the parties' choice of New York law in the Distribution Agreement applies to all of Baumgardner's claims.

**B.     Motion to Dismiss**

The propriety of dismissal pursuant to Rule 12(b)(6) is a question of law and "[d]ismissal is appropriate when a plaintiff fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). We assume the factual allegations in the complaint are true and construe the complaint in the light most favorable to the plaintiff." *Comtide Holdings, LLC v. Booth Creek Management Corp*., 335 Fed. Appx. 587 (6th Cir. 2009) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). In construing the complaint in the light most favorable to the non-moving party, "the court does not accept the bare assertion of legal conclusions as enough, nor does it accept as true unwarranted factual inferences." *Gritton v. Disponett*, 332 Fed. Appx. 232 (6th Cir. 2009) (citing *In re Sofamor Danek Group, Inc*., 123 F.3d 394, 400 (6th Cir. 1997)). To survive a Rule 12(b)(6) motion, "the nonmoving party must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).[4]

**1.     Claim Four: Intentional Interference with Contract**

Baumgardner's fourth claim for relief seeks damages for intentional interference with contract. Accepting, as the Court must, the factual allegations in his complaint as true,

---

[4] In his opposition, Baumgardner primarily relies on *Conley v. Gibson*, 355 U.S. 1941 (1957), to set forth the standard of review that applies to BFBD's motion to dismiss. The rule in *Conley*, which stated "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim," has been abrogated by *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). Counsel is reminded that "diligent research, which includes Shepardizing cases, is a professional responsibility."*Cimino v. Yale University*, 638 F. Supp. 952, 959 n.7 (D. Conn. 1986).

Baumgardner "entered into a contract for the sale of the Route to Lori Turner for the amount of $325,000." (Doc. No. 1 at ¶ 54.) BFBD had knowledge of Baumgardner's agreement to sell the Route, but "withheld its approval of the sale without good cause to do so." (*Id.* at ¶¶ 55-56.) BFBD acted with the "specific intent to prevent the sale to Ms. Turner so that [BFBD] could obtain the control of the Route for a price less than market value." (*Id.* at ¶ 57.) As a result of BFBD's refusal to approve the sale, Baumgardner "lost his potential buyer and was forced to sell the Route to [BFBD]" and sustained monetary damages. (*Id.* at ¶¶ 58-59.)

Under New York law, "there are four elements to the tort of intentional interference with contractual relations: (i) existence of a valid contract; (ii) defendant's knowledge of that contract; (iii) defendant's intentional procurement of the breach of that contract; and (iv) damages caused by the breach." *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995). *See also Lama Holding Co. v. Smith Barney Inc*., 668 N.E.2d 1370, 1375 (N.Y. 1996) ("Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."). "[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 621 (N.Y. 1996).

### a.      The Existence of a Valid Contract

BFBD argues that claim four fails as a matter of law because the contract between Baumgardner and Turner was subject to "two conditions precedent that had to be met before

Plaintiff could enter into a contract to sell or otherwise transfer his distribution rights." (Doc. No. 15 at p. 4.)  According to BFBD, because the two conditions precedent, BFBD's prior written approval and BFBD's right of first refusal, were not met, the contract was never created or enforceable. (*Id.*) Baumgardner, in opposition, contends that the Distribution Agreement did not prohibit his right to enter a contract with Turner subject to BFBD's approval and right of first refusal.

As Baumgardner notes, however, the Court must accept the factual allegations in Baumgardner's complaint as true, and Baumgardner has specifically alleged he entered into a "valid contract" with Turner. Moreover, a failure to satisfy a condition precedent excuses performance under a contract, or, alternatively put, renders a contract unenforceable, but does not affect the validity of the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 224 ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.") While BFBD argues that the contract between Baumgardner and Turner was "never created," and this Court acknowledges that a few courts have treated the failure of a condition precedent as preventing the creation a contract, the Court adopts the view of the Restatement that "it is better to view a contract as already in existence, but with the parties' respective performances subject to the specified event, which is a condition to their respective performances." *Id.* at cmt. c. Under this view, while Baumgardner's contract with Turner may not have been enforceable, it was valid. And New York law only requires the "existence of a valid contract." *See, e.g., G.K.A. Beverage, supra.* Thus, for the purposes of this motion to dismiss, Baumgardner adequately alleges the existence of a valid contract.

9

b.      *Defendant's Knowledge of That Contract*

This element is not disputed. Baumgardner has adequately alleged BFBD's knowledge of his contract to sell the Route to Turner.

c.      *The Defendant's Intentional Procurement of the Breach of That Contract*

Courts applying New York law have expounded on the crucial third element of an intentional interference with contract claim. "It is a familiar proposition that one 'who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing *the third person not to perform* the contract, is subject to liability to the other for the pecuniary loss resulting to the other *from the failure of the third person to perform* the contract." *White Plains Coat & Apron Co., Inc. v. Cintas Corp*., 8 N.Y.3d 422, 425 (2007) (citing RESTATEMENT (SECOND) OF TORTS § 766) (emphasis added). A party intentionally and improperly interferes with a contract when he induces or otherwise causes a third person not to perform his contractual obligations to plaintiff. *Walther v. Bank of New York*, 772 F. Supp. 754, 769 (S.D.N.Y. 1991). "In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract *by the other party*." *Jack L. Inselman & Co. v. FNB Financial Co*., 41 N.Y.2d 1078, 1080 (1977) (emphasis added). Therefore, Baumgardner's intentional interference with contract claim must fail as a matter of law unless he has alleged factual allegations (rising above a speculative level) that BFBD has "induced" or "otherwise caused" Turner to not perform her contractual obligations to him.

(i).      "Inducing"

"The word 'inducing' refers to the situations in which [the defendant] causes [the third party] to choose one course of conduct rather than another." RESTATEMENT (SECOND) OF

TORTS § 766. Here, Baumgardner's claim cannot survive because he has not made any factual allegations that BFBD caused the third party, Turner, to choose a course of conduct resulting in the breach of the Baumgardner-Turner contract. Indeed, Baumgarder has not alleged any contact at all, much less improper contact, between BFBD and Turner. Indeed, Baumgardner alleges only that BFBD's conduct forced *him* not to be able to perform his contractual obligations by unreasonably exercising its rights under the Distribution Agreement. In his opposition, Baumgardner describes a litany of actions taken by BFBD to create "financial burdens, which could not be overcome by *Baumgardner.*" (Doc. No. 13 at p. 4 (emphasis added).) Nowhere does Baumgardner allege that BFBD did anything to induce or encourage Turner to breach the Baumgardner-Turner contract.

(ii).    "Otherwise Causing"

"The phrase 'otherwise causing' refers to the situations in which [the defendant] leaves [the third party] no choice [but not to perform the contract]." RESTATEMENT (SECOND) OF TORTS § 766. The Restatement provides three examples of conduct covered by the "otherwise causing" test:

> for example, when [the defendant]  imprisons or commits such a battery upon [the third party] that he cannot perform his contract with [the plaintiff], or when [the defendant] destroys the goods that [the third party] is about to deliver to [the plaintiff]. This is also the case when performance by [the third party] of his contract with [the plaintiff] necessarily depends upon the prior performance by [the defendant] of his contract with [the third party] and [the defendant]  fails to perform in order to disable [the third party] from performing for [the plaintiff].

*Id.* It is true that in each of the examples cited above, some action by the defendant renders performance by the third party impossible. And, indeed, a 1993 Court of Appeals of New York decision restates the third element of the tortious interference with contractual relations as "(3) defendant's intentional inducement of the third party to breach *or otherwise render performance*

*impossible* [. . .]." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993)[5] (emphasis added). This subtle change goes wholly unexplained by the court in *Kronos*, which was faced with the sole question of "whether the cause of action accrued when the contract was breached [or] when plaintiff alleges it first suffered actual damages as a result of [defendant's] tortious conduct" and did not elucidate any reasons for its language substitution as to the third element. *Id.* at 92.

While seemingly a harmless substitution of largely synonymous language, some courts interpreted *Kronos* as expansively and fundamentally altering the elements of tortious interference with contract. *See NFL Props. v. Dallas Cowboys Football Club*, 922 F. Supp. 849, 856 (S.D.N.Y. 1996) (Scheindlin, J.) ("*Kronos* suggests that a plaintiff can state a claim for tortious interference with contract without actually alleging that the third party breached its contract."); *Museum Boutique Intercontinental v. Picasso*, 886 F. Supp. 1155, 1163 (S.D.N.Y. 1995) (Scheindlin, J.) ("*Kronos* suggests that [. . .] an allegation of breach is not an absolute prerequisite for the tort [. . .]. If the third party has not breached the contract, however, a plaintiff must allege that defendant's actions induced the third party to somehow render performance impossible."); *see also Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 201-202 (E.D.N.Y. 2007) (examining whether a plaintiff must establish that a third party, as opposed to a plaintiff, breached a contract to prevail on a tortious interference with contract claim and noting the court's belief that *Lama Holding* and *Kronos* offered conflicting language).

*NFL Props* and *Museum Boutique Intercontinental* were both decided before the

---

[5] The Court's research indicates that *Kronos* is the first New York case to substitute the term "otherwise render performance impossible" for the term "otherwise causing" the third person not to perform. Of the 65 cases post-*Kronos* that employ its language, each one cites to *Kronos* as authority (or to a case that cites *Kronos*), save three. Two cases, *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 608 (E.D.N.Y. 2000), and *Pacific Carlton Dev. Corp. v. 752 Pac., LLC*, 878 N.Y.S.2d 421, 423 (N.Y. App. Div. 2d Dep't 2009), contain the language found in *Kronos*, but inexplicably cite to *Lama Holding* (which does not contain the "otherwise render performance impossible" language, *see supra*). The third case, *Winters Bros. Recycling Corp. v. Jet Sanitation Serv. Corp.*, 2009 NY Slip Op 50753U, 3 (N.Y. Sup. Ct. 2009), also contains the *Kronos* language, but cites to *White Plains Coat & Apron Co.* (which also does not contain the "otherwise render performance impossible" language, *see supra*).

Court of Appeals of New York decided *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614 (1996). In *NBT Bancorp*, the Court stated "[e]ver since tortious interference with contractual relations made its first cautious appearance in the New York Reports [. . .] our Court has repeatedly linked availability of the remedy with a breach of contract." *Id.* at 620. The proposition that conduct that "rendered performance of the contract impossible" but where "there was no breach of contract" could satisfy the requirements to prove tortious interference with contract under New York law runs contrary to the rulings of the New York Court of Appeals and the Second Circuit. *Fonar Corp. v. Magnetic Resonance Plus*, 957 F. Supp. 477 (S.D.N.Y. 1997) (noting that *Inselman's* dictate that "in order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of contract by the other party" was cited "with approval and its holding affirmed" by *NBT Bancorp*).

*Italverde Trading,* however, expanded tortious interference with contract in a manner that purported to adhere to *NBT Bancorp's* requirement of an actual breach of the contract. In that case, the court endorsed the language in *Kronos* and allowed a plaintiff's claim for tortious interference with contract to survive a motion to dismiss where the plaintiff alleged that the defendant's interference caused *plaintiff*, not the third-party, to breach the contract in question. *Italverde Trading*, 485 F. Supp. 2d at 201-202. While the court in *Italverde Trading* found, consistent with *NBT Bancorp*, that a plaintiff must demonstrate an actual breach of a contract, the court relied on § 766A of the Restatement and two New York state lower court decisions to hold that a cause of action for tortious interference with contract could be maintained where plaintiff alleges that defendant's conduct caused plaintiff to breach the

13

contract. *Id. See* RESTATEMENT (SECOND) OF TORTS § 766A[6] (entitled "Intentional Interference with Another's Performance of His Own Contract"); *Stiso v. Inserra Supermarkets, Inc*., 578 N.Y.S.2d 680, 682 (N.Y. App. Div. 1992) (defendant's exclusion of plaintiff-sales representative from its stores constituted tortious interference with plaintiff's exclusive distribution contract with distributor); *Morris v. Blume*, 55 N.Y.S. 2d 196, 199 (Sup. Ct. N.Y. Cy. 1945) (holding that "[a]n unlawful interference with a person in the performance of his contract with a third party is just as much a legal wrong as is an unlawful inducement of a breach of contract by the third party.").

A closer examination of the New York state cases cited by *Italverde Trading* cast serious doubt on their persuasive effect. In *Stiso*, the plaintiff (Stiso) was an independent sales representative who had purchased a distribution delivery area from a food distributor (Natsnax). The defendant (Inserra Supermarkets) was the owner of several grocery stores within Stiso's distribution area that stocked Natsnax products. One of Inserra Supermarkets' employees became suspicious that Stiso was stealing from defendant, confronted Stiso and brought him to the store security room and demanded repayment of $7,000.[7] Relevant here, Stiso was told he could no longer make delivery to Inserra Supermarkets' stores. Because Inserra still desired Natsnax service, however, Stiso was "unable to perform the requirement in his contract with Natsnax to maintain service to all outlets in his sales area that requested service." *Stiso,* 578 N.Y.S.2d at 682. The court affirmed a jury verdict with respect to a tortious interference with contract claim on the theory that Inserra Supermarkets' actions caused Stiso to breach his contract with

---

[6] In its entirety, § 766A states: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him." *Id.*
[7] Stiso also recovered for unlawful imprisonment and "an unspecified tort involving extortion and duress." *Stiso,* 578 N.Y.S.2d at 681-82.

Natsnax.[8]

In its opinion, however, *Stiso* stated "the elements of a cause of action for tortious interference with contract are 'the existence of a valid contract and damages caused by the wrongdoer's knowledge of and intentional interference with that contract without reasonable justification.'" *Stiso*, 578 N.Y.S.2d at 682 (citing *Schulz v. Washington County*, 550 N.Y.S.2d 446, 449 (N.Y. App. Div. 3d Dep't 1990)). *Schulz*, in turn, cites to *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183 (1980), for this proposition of law. In *Guard-Life*, the plaintiff (Guard-Life) entered into a five-year exclusive distribution contract with a Japanese lock manufacturer (Kokusan) that was voidable by either party upon one year's prior written notice. *Id.* at 187. In the first year of that contract, the defendant (S. Parker Hardware) initiated conversations with the third party, Kokusan,[9] to establish a business relationship. These negotiations led to the execution of a formal agreement between S. Parker Hardware and Kokusan providing that Kokusan would supply locks to Parker exclusively in accordance with conditions to be specified in Parker's orders. The court in *Guard-Life* held that interference with the performance of a voidable contract was to be treated as interference with contracts terminable at will for purposes of imposing liability in tort.

While the *dissent* did state its view that "Guard-Life need only show that defendant intentionally interfered with its contractual rights, without justification and with knowledge of the contract to make out a cause of action," that statement was made to

---

[8] It is unclear from the opinion whether Stiso actually breached his contract with Natsnax, or whether Inserra Supermarkets merely interfered with his performance of the contract. In the event of the latter, the Court of Appeals of New York's subsequent decision in *NBT Bancorp* and the requirement of an actual breach of contract would preclude recovery by Stiso. The remainder of this section assumes that Inserra Supermarkets' action in fact caused the breach of the Stiso-Natsnax contract.

[9] The conversations initiated by S. Parker Hardware were actually with a company named Katsura Company, Inc., but "[s]olely for the purpose of the motion that is the subject of the present appeal, Parker accepts Guard-Life's contention that Parker's transactions with Katsura were the equivalent of doing business with Kokusan." *Guard-Life Corp.*, 50 N.Y.2d at 187. To eliminate confusion, this Court will refer to the third party in the case as Kokusan.

demonstrate the dissent's dissatisfaction with the majority's treatment of interference with a voidable contract as the same as interference with an at will contract for the purposes of tort liability, *not* to authoritatively establish the elements of tortious interference under New York law, and *certainly not* for the proposition that liability for tortious interference with contract can be supported where the plaintiff, and not a third party, breaches the contract. Indeed, in *Guard-Life*, there was no question that the party that allegedly breached the agreement was the third party, Kokusan. Therefore, *Stiso's* reliance on the language from *Guard-Life* (via *Schulz*) for the proposition that tortious interference with contract does not require a third party breach of contract is misplaced.

    *Italverde Trading* also cited *Morris v. Blume*, *supra*, for the proposition that "[a]n unlawful interference with a person in the performance of his contract with a third party is just as much a legal wrong as is an unlawful inducement of a breach of contract by the third party." *Id.* at 199. *Morris*, a sixty-four year old trial court decision, is simply no longer good law under current New York precedent. The court in *Morris* characterized the plaintiff's complaint as follows:

> Plaintiff is suing, not for specific performance of an agreement of employment, *not for breach of contract* of employment, *not even for wrongfully inducing a breach of contract*. The entire complaint assumes an existing agreement with the corporation, and charges the defendant Joseph S. Blume with *wrongfully interfering with plaintiff's performance* of his contract with the corporation.

*Morris*, 55 N.Y.S.2d at 198 (emphasis added). As noted by the court in *Italverde Trading*, "[. . .] on those occasions on which the Court of Appeals [of New York] has explicitly reached the question of whether the plaintiff is required to show that the contract was actually breached, such a showing *is in fact required.*" *Italverde Trading*¸ 485 F. Supp. 2d at 202 (emphasis added) (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614 (1996) (finding that

16

the "controversy center[ed] on [. . .] whether breach of contract is essential to a claim for tortious interference with contractual relations" and holding that "[e]ver since tortious interference with contractual relations made its first cautious appearance in the New York courts [. . .] our Court has repeatedly linked availability of the remedy to breach of contract"); *Jack L. Inselman & Co. v. FNB Fin. Co*., 41 N.Y.2d 1078 (1977) (holding that defendant was entitled to summary judgment on tortious interference with contract claim because plaintiff failed to establish a breach of contract)). Thus, the conclusion in *Morris* that the defendant's interference with plaintiff's performance of his contract, not amounting to breach of contract, can properly sustain a claim for tortious interference with contract is no longer tenable in light of *NBT Bancorp*.[10]

The court in *Italverde Trading* reached its holding by coupling the decisions in *Stiso* and *Morris* with the reasoning of a comment accompanying § 766A of the Restatement that states:

> *Rationale*. This Section and § 766 both involve interference with an existing contract. Under § 766, the plaintiff's interest in obtaining performance of the contract is interfered with directly. Under this Section the interference is indirect, in that the plaintiff is unable to obtain performance of the contract by the third person because he has been prevented from performing his part of the contract and thus from assuring himself of receiving the performance by the third person. But the interference with receiving the benefits of obtaining the performance is just as real as in a case coming under § 766.

RESTATEMENT (SECOND) OF TORTS § 766A cmt (c). "The New York courts have never expressly adopted Section 766A."[11] *D'Andrea v. Rafla-Demetrious*, 146 F.3d 64 (2d Cir. 1998). *Italverde Trading* concedes this fact, and also notes that the Court of Appeals of New York has in fact *rejected* portions of that section. *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59

---

[10] The Court notes that *Morris* has not been cited by any decision except *Italverde Trading* since the Court of Appeals of New York issued its decision in *NBT Bancorp*.

[11] To be clear, neither has the Court of Appeals of New York adopted the test set forth in § 766. *NBT Bancorp* made clear that while *Guard-Life* carefully reviewed several Restatement sections in discerning the law of tortious interference with contract in New York, it did not adopt the Restatement test. Among other differences, and relevant here, "the line of authority from *Posner* to *Inselman*, requiring breach for claims of tortious interference with contractual relations, was left undisturbed." *NBT Bancorp*, 87 N.Y.2d at 622 n.1.

N.Y.2d 314 (1983) (declining to reach the question of whether New York should adopt the portion of 766A which permits a cause of action for merely making performance more expensive or burdensome and noting that "[n]o New York cases recognizing such a cause of action has been cited or has been found by us."); *D'Andrea*, 146 F.3d at 66 ("Absent such authority [supporting Section 766A], we decline to hold that the New York Courts would recognize [a Section 766A] exception to the rule requiring 'actual breach' in order to state a claim for tortious interference with contractual relations.").

This Court believes, contrary to the holding in *Italverde Trading*, that the tests espoused in *Kronos* and *Lama Holding* do not conflict and that the Court of Appeals of New York in *Kronos* did not alter the requirement that a plaintiff must show a third party's breach of a contract when it, without explanation, substituted the words "or otherwise render performance impossible" for the words "or otherwise cause" in establishing the elements of tortious interference with contract under New York law. Indeed, *Kronos* cites *Israel v. Wood Dolson Co*., 1 N.Y.2d 116 (1956), as authority for the elements of the test, and *Israel* clearly requires a third party breach. *Id.* at 120 ("An essential element of the [tortious interference with contract] case against [the second named defendant] is the breach of the contract by [the first named defendant]. Israel's second cause of action must fail if there was no such breach."). Moreover, the Court of Appeals of New York has, subsequently to *Kronos*, reaffirmed that a "defendant's intentional procurement of the *third-party's breach* of the contract without justification" is required to prove tortious interference with contract under New York law. *Lama Holding Co*., 88 N.Y.2d at 424 (1996) (emphasis added).  *See also White Plains Coat & Apron Co*., 8 N.Y.3d at 425 (2007) (same).

Turning back to the complaint in this case, it remains that Baumgardner's tortious

18

interference with contract claim must fail because he has not made any factual allegation that BFBD "induced" or "otherwise caused" Turner to breach the Baumgardner-Turner contract. As discussed in the previous section, Baumgardner has merely alleged that BFBD, by unreasonably withholding its approval of the Baumgardner-Turner contract, caused Baumgardner to breach the contract. Under New York law, this is insufficient as a matter of law to state a claim for tortious interference with contract.[12]

Under New York law, a plaintiff must prove "intentional procurement of the third-party's breach of the contract without justification" by the defendant by showing the defendant "induc[ed] or otherwise caus[ed] the third person not to perform the contract." *White Plains Coat & Apron Co.,* 8 N.Y.3d at 425. Moreover, an "actual breach of the contract" by that third party is necessary to recover for intentional interference with contract. *See Lama Holding Co.*, 668 N.E.2d at 1375. In this case, Baumgarder has not alleged either. Therefore, his claim fails as a matter of law and BFBD's Rule 12(b)(6) motion to dismiss is **GRANTED** with respect to claim four.

### 2. Claim Five: Unjust Enrichment

BFBD argues that claim five must be dismissed as a matter of law because a plaintiff cannot recover in quasi-contract where an express contract governs the parties' relationships. The Court agrees.

Before turning to a specific discussion of unjust enrichment under New York law, the Court will briefly review some principles of general applicability. A claim for unjust

---

[12] The Court notes that Baumgardner is not left without a remedy for his allegation that BFBD improperly withheld its consent to his sale of the Route to Turner and suffered damages to the extent he was forced to sell the Route for a lower price. The Court of Appeals of New York has referenced tortious interference with contract's "function as a back-up remedy for breaches of contract." *NBT Bancorp*, 87 N.Y.2d at 624. Indeed, in this case, claim three of Baumgardner's complaint (Breach of Contract – Right of First Refusal) is nearly indistinguishable from his now-dismissed tortious interference claim (claim four). As such, no "back-up remedy" is warranted, or needed.

enrichment is an equitable claim, and is based on a legal fiction where courts will imply a "contract" as a matter of law. *See Wuliger v. Mfrs. Life Ins. Co. (USA),* 567 F.3d 787, 799 (6th Cir. 2009) ("Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another."); *Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) ("Unjust enrichment is an equitable claim."). To avoid the injustice that would otherwise result if one party retained a benefit that belongs to another, the court will "create" an agreement deriving not from a "real" contract, but a "quasi-contract." *See, e.g., Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999); *see also Reisenfeld & Co. v. Network Group, Inc*., 277 F.3d 856, 860 (6th Cir. 2002) ("A contract implied-in-law, or 'quasi-contract' is not a true contract, but instead a liability imposed by courts in order to prevent unjust enrichment."); *Bradkin v. Leverton*, 26 N.Y.2d 192, 196 (1970) (The law creates [the quasi-contractual obligation], regardless of the intention of the parties, to assure a just and equitable result.").

An implied-in-law, "quasi-contract," however, is neither necessary nor appropriate when an express contract governs the dispute between the parties. "Where, however, there is an enforceable express or implied in fact contract that regulates the relations of the party or that part of their relations about which issues have arisen, *there is no room for quasi contract*." 1-1 CORBIN ON CONTRACTS § 1.20 (emphasis added). *See also Sewell v. 1199 Nat'l Benefit Fund for Health and Human Servs*., No. 04-4474, 2005 U.S. Dist. LEXIS 12311 at *5 (S.D.N.Y. June 22, 2005) ("Unjust enrichment is an equitable claim that, under New York law (which governs this claim here), will not lie where the rights and relationships on which it is premised is governed by an express contract.").

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution. The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citations omitted). Under New York law, quasi-contractual claims such as unjust enrichment are barred if a written contract between the parties governs the subject matter of their dispute. *See Briggs v. Goodyear Tire & Rubber Co*., 79 F. Supp. 2d 228, 236 (W.D.N.Y.1999). *See also Clark-Fitzpatrick, Inc. v. Long Island R. Co*., 516 N.E.2d 190, 193 (N.Y. 1987) ("A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment."). "It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.*

To illuminate this discussion, the Court reproduces, from Baumgardner's complaint, his allegations of unjust enrichment in their entirety:

> 60.  Plaintiff Baumgardner realleges and incorporates paragraphs 1 through 59 of this Complaint as if fully rewritten herein.

> 61. Due to Defendant Bimbo Food Bakeries Distribution Inc.'s wrongful conduct, Plaintiff Baumgardner was forced to sell the Route to Defendant Bimbo Food Bakeries Distribution Inc. for less that [sic] market value.

> 62. Defendant Bimbo Food Bakeries Distribution Inc. has been unjustly enriched to the extent that it has acquired the rights to the Route for less than the market value.

> 63.  Plaintiff Baumgardner suffered damages to the extent that Defendant Bimbo Food Bakeries Distribution Inc. paid less than market value for the Route.

(Doc. No. 1 at ¶¶ 60-63.) It is evident from the face of the allegations contained in count five of

the complaint that Baumgardner seeks damages for the breach of the distribution agreement, an express contract. The distribution agreement, in a separately enumerated section entitled "TRANSFER OF RIGHTS," governs the conditions of assignability of the Route. The conditions of assignability state that "any sale such sale or transfer [of the Route] shall be subject to" BFBD's prior written approval, "which approval will not be unreasonably withheld" and "a right of refusal on the part of [BFBD] at the same terms and conditions offered to [Baumgardner] by a bonafide purchaser or transferee." (Distribution Agreement at ¶ 6.1.) The "damages to the extent that Defendant Bimbo Food Bakeries Distribution Inc. paid less than market value for the Route" are premised on Baumgardner's claims that BFBD unreasonably withheld its consent to the sale of the Route to Turner and exercised its right of refusal at a greatly reduced price than those offered to Baumgardner by Turner, not "at the same terms and conditions." (Doc. 2-1 at ¶¶ 63, 11-14.)

While Baumgardner, in his opposition memorandum, argues that his unjust enrichment claim should not be dismissed because the complaint "makes references throughout to the malicious conduct of [BFBD] taken in bad faith and with the intent to harm Baumgardner," those references are directed at BFBD's alleged conduct in breaching the express contract, specifically the terms related to the transfer of rights to the Route. Article Six of the Distribution Agreement plainly governs these claims, as discussed above. Neither party has alleged that the distribution agreement, the express contract, is not enforceable. And, as discussed above, under New York law, *see Briggs, supra,* where a valid, express contract governs a dispute, a party cannot seek damages on the alternative theory of quasi-contract.

Despite the universal and uncontroversial principle that a party may not recover under both a theory of unjust enrichment and breach of contract, the Court is aware that plaintiffs

often plead unjust enrichment as an alternative theory of recovery alongside breach of contract claims. And it is true that Rule 8 explicitly allows a party to plead inconsistent claims. FED. R. CIV. P. 8(d)(3). While alternative pleading of unjust enrichment and breach of contract can be permissible, it is inappropriate in situations, like the one presented here, where the complaint "sets forth no plausible basis to invoke unjust enrichment because there is no dispute that" the Distribution Agreement is valid and that the conduct complained of is explicitly covered by that express contract. *See Ebusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC*, 2009 U.S. Dist. LEXIS 122193 (S.D.N.Y. December 29, 2009); *see also Clark-Fitzpatrick*, 521 N.Y.S.2d at 656 (granting motion to dismiss quasi contract claim in light of existence of written contract defining relationship between parties and "fully detailing all applicable terms and conditions").

Courts allow alternative pleading of unjust enrichment and breach of contract when faced with scenarios where one party alleges that the express contract is unenforceable or invalid, or does not encompass the dispute at issue. Under New York law, "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon [a quasi-contractual theory] and will not be required to elect his or her remedies." *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225, 228 (N.Y. App. Div. 1st Dep't 1993). This case does not present such a scenario. As discussed in the preceding paragraphs, neither party has alleged that the distribution agreement is unenforceable or invalid. The dispute at issue is explicitly encompassed by Article Six of the Distribution Agreement, which establishes the requirements under which Baumgardner may transfer his rights in the Route. Baumgardner's complaint sets forth no plausible basis to invoke recovery through unjust enrichment because there is no dispute that the Distribution Agreement is valid,

and the conduct complained of is explicitly covered by that agreement. *See Ebusinessware, Inc., supra.*

   For the foregoing reasons, BFBD's Rule 12(b)(6) motion to dismiss is **GRANTED** with respect to Baumgardner's unjust enrichment claim.

   **3.**  **Claim Seven: Breach of Fiduciary Duty**

   Claim seven is premised on the conclusory allegation that "Plaintiff Baumgardner and Defendant BFBD Food Bakeries Distribution Inc. had a fiduciary relationship of distributor and operator." As BFBD notes in its motion, the express language of the distribution agreement, which lays out the terms of the relationship between Baumgardner as an operator and BFBD as a distributor, states "[n]o fiduciary relationship exists between the parties." (Doc. No. 6 at p. 12; Distribution Agreement, ¶ 2.3.) In his opposition, Baumgardner concedes that "BFBD had no fiduciary obligation regarding the normal operation of the Route" but that this changed "upon BFBD's termination of the agreement and seizing of Baumgardner's Route." (Doc. No. 13 at p. 5.) Baumgardner then asks this Court to imply "through the [later] relationship of the parties that BFBD was required to act as Baumgardner's fiduciary in running the route in a manner which would not harm the business relationship [. . .]." (*Id.*) This, the Court declines to do. The Distribution Agreement specifies the rights and responsibilities of the parties with respect to the operation of the Route by BFBD after termination. (Distribution Agreement, ¶ 8.4 "Actions Following Termination".) The conduct complained of arises out of an express provision of the parties' agreement and the agreement expressly provides that no fiduciary relationship exists between the parties. The Court will not ignore this express term of the agreement.

   For the foregoing reasons, BFBD's Rule 12(b)(6) motion to dismiss is **GRANTED** with respect to Baumgardner's breach of fiduciary duty claim.

### 4.      Claim Eight: Punitive Damages

In the eighth claim of his complaint, Baumgardner seeks punitive damages.[13] BFBD correctly notes that the distribution agreement expressly forecloses punitive damages in paragraph 11.2, which states "[n]otwithstanding anything to the contrary contained in this Agreement, in no event shall either party be liable to the other for any consequential, incidental, indirect or special damages, including lost profits or punitive damages." (Doc. No. 6 at p. 6.) Baumgardner acknowledges this fact, and states in his opposition that he "is not seeking damages for BFBD's breach of contract" but rather for "the separate claims and allegations created by BFBD['s] intentional and malicious conduct which went beyond the contract terms." (Doc. No. 13 at p. 6.)

Baumgardner's claim for punitive damages as based on his claims sounding in tort, claims four and seven, fails as a matter of law because, as discussed in the preceding paragraphs, those claims are dismissed. Baumgardner's surviving claims, based in contract, fail as a matter of law because (1) under New York law, punitive damages are not recoverable for an ordinary breach of contract, and (2) because the Distribution Agreement expressly precludes punitive damages.

#### a.      Punitive Damages are not Recoverable for an Ordinary Breach of Contract

"[P]unitive damages, unlike compensatory damages and injunction, are generally not available for breach of contract." *Barnes v. Gorman*, 536 U.S. 181, 187 (2002). In *Rocanova v. Equitable Life Assurance Society of the United States*, 83 N.Y.2d 603, 634 N.E.2d 940, 612

---

[13] Under New York law, "a demand for punitive damages does not amount to a separate cause of action for pleading purposes." *See Rose Lee Mfg. v. Chem. Bank,* 588 N.Y.S.2d 408, 410 (N.Y. App. Div. 1992). A "demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Rocanova*, 634 N.E.2d at 945-46. While Baumgardner's claim for punitive damages is therefore technically improper, the Court will construe his complaint as seeking punitive damages as an available remedy attached to a substantive cause of action, in light of Rule 8's dictate that "[n]o technical form of pleading is required" and "[p]leadings must be construed so as to do justice." FED. R. CIV. P. 8(d)(1), 8(e).

N.Y.S.2d 339 (1994), the Court of Appeals of New York stated that "punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights," and that punitive damages were recoverable only when the breach also involved a particularly egregious fraud that "was aimed at the public generally." In *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308 (1995), decided the year after *Rocanova*, the Court of Appeals of New York made it even more clear that punitive damages were recoverable in a contract action only "if necessary to vindicate a public right." *Id.* at 315. The Second Circuit Court of Appeals has articulated the "public aim requirement in *Rocanova* and more recently in *New York University*" by distinguishing "a gross and wanton fraud upon the public," which satisfies the public aim requirement, and "an isolated transaction incident to an otherwise legitimate business," which does not. *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 95 (2d Cir. 2005) (citing *Walker v. Sheldon*, 10 N.Y.2d 401, 406 (1961)).

In this case, Baumgardner has not alleged that BFBD's conduct was anything more than "an isolated transaction incident to an otherwise legitimate business." *See TVT Records, supra*. In *TVT Records*, the Second Circuit held that "incidental effects" of a party who breaches a contract's actions "do not constitute conduct directed at the public generally." *TVT Records*, 412 F.3d at 95 (rejecting contention that a record company's breach of a contract had an impact upon the public because it "impaired the creation and dissemination of a work of art that TVT intended to sell to the general public and which it had already advertised to the public at large"). The conduct involved in this case—that BFBD breached the Distribution Agreement by improperly withholding its consent to Baumgardner's sale of the Route to Turner and applied financial pressures to force the eventual sale of that Route for below market value—cannot satisfy the public aim requirement to support punitive damages for a breach of contract as

required by New York law.

        *b.*     *The Distribution Agreement Explicitly Precludes Punitive Damages*

As set forth above, Paragraph 11.2 of the Distribution Agreement explicitly precludes punitive damages. Under longstanding New York precedent, "[p]arties to contracts have the right to insert any stipulations that may be agreed to; provided that they be neither unconscionable, nor contrary to public policy." *Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485 (1910). New York courts allow parties to limit their liability, "subject only to the requirement that the limitation be not so obscured as to make it probable that it would escape plaintiff's attention." *Florence v. Merchants C. Alarm Co.*, Inc., 51 N.Y.2d 793, 795 (1980). Moreover, New York law "dictate[s] that unambiguous contract terms should be enforced according to their terms." *Greater E. Transp. LLC v. Waste Mgmt. of Conn., Inc.*, 211 F. Supp. 2d 499, 502 (S.D.N.Y. 2002).

Here, the Distribution Agreement sets forth, in bolded print and in a separately enumerated paragraph, that "in no event shall either party be liable to the other for any consequential, incidental, indirect or special damages, including lost profits and punitive damages." (Doc. No. 13 at p. 6.) Baumgardner has not alleged that this term is ambiguous, or was obscured to make it probable that it would escape his attention.[14] The Court will not ignore this express term of the agreement. Thus, his claim for punitive damages fails as a matter of law for the additional reason that the contract between the parties expressly precludes the recovery of punitive damages.

Therefore, for the foregoing reasons, BFBD's Rule 12(b)(6) motion to dismiss is **GRANTED** with respect to Baumgardner's punitive damages claim.

---

[14] Indeed, Baumgardner's signature appears on the same page.

**B.       Motion to Strike Demand for Jury Trial**

        The right of trial by jury in civil actions is protected by the Seventh Amendment to the Constitution and is "to be determined as a matter of federal law in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963). That right, however, may be waived by prior written agreement of the parties. *See K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 755 (6th Cir. 1985). When a contract contains an express jury waiver provision, the party objecting to that provision has the burden of demonstrating that its consent to the waiver was not knowing and voluntary. *Id*. at 758. District courts in the Sixth Circuit have held that even where "tort claims arise out of and relate to the contract and the negotiations which led to the contract, it is altogether appropriate to apply the contractual jury waiver clause." *Efficient Solutions, Inc. v. Meiners' Country Mart, Inc*., 56 F. Supp. 2d 982, 984 (W.D. Tenn. 1999) (citing *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835 (10th Cir. 1988) (enforcing a jury waiver clause with respect to plaintiff's claims that the contract was procured through fraud and negligent misrepresentation)).

        BFBD seeks to strike Baumgardner's jury demand, arguing that the right to a jury trial in this action is waived by section 11.13 of the distribution agreement. Section 11.13 states, in its entirety:

> NO JURY TRIAL: The parties hereby knowingly, voluntarily and intentionally waive the right either of them may have to a trial by jury in respect of any litigation based hereon or arising out of this Agreement or any acts, omissions, transactions or course of dealing hereunder.

(Doc. 1-A at p. 18.) In his opposition, Baumgardner does not argue that this waiver was not procured in a knowing or voluntary manner, but that "the allegations of Baumgardner's complaint are not based solely on the contract and do not arise solely out of the agreement." (Doc. 13 at p. 7.) Examining Baumgardner's surviving claims, however, it is apparent that claims

28

one, two, and three are explicitly covered by the jury waiver clause. Each of these claims, on their face, allege breaches of the distribution agreement.

Therefore, for the foregoing reasons, BFBD's motion to strike Baumgardner's jury demand is **GRANTED.**

## III.    CONCLUSION

### A.    Motion to Dismiss

For the foregoing reasons, BFBD's motion to dismiss (Doc. No. 6) is:

(1) **GRANTED** with respect to claim four, intentional interference with contract.

(2) **GRANTED** with respect to claim five, unjust enrichment.

(3) **GRANTED** with respect to claim seven, breach of fiduciary duty.

(4) **GRANTED** with respect to claim eight, punitive damages.

### B.    Motion to Strike Jury Demand

Additionally, BFBD's motion to strike Baumgardner's jury demand (Doc. No. 7) is **GRANTED.**

**IT IS SO ORDERED**.

Dated:      March 2, 2010

_____
**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**